UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRENT NICHOLSON, *et al.*,

Plaintiffs,

v.

THRIFTY PAYLESS, INC., *et al.*,

Defendants.

No. C12-1121RSL

ORDER GRANTING IN PART THRIFTY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter comes before the Court on "Thrifty's Motion for Partial Summary Judgment Dismissing Lease and Good Faith Counts." Dkt. # 25. Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact that would preclude the entry of judgment as a matter of law. L.A. Printex Indus., Inc. v. Aeropostale, Inc., 676 F.3d 841, 846 (9th Cir. 2012). The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and identifying those portions of the materials in the record that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)(1)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to identify specific factual disputes that must be resolved at trial. Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055, 1059 (9th Cir. 2012). The mere existence of a scintilla of evidence in support of the non-moving

party's position will not preclude summary judgment, however, unless a reasonable jury viewing the evidence in the light most favorable to the non-moving party could return a verdict in its favor. U.S. v. Arango, 670 F.3d 988, 992 (9th Cir. 2012).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties in the light most favorable to plaintiffs and having heard the arguments of counsel, the Court finds as follows:

**BACKGROUND**

Plaintiff Brent Nicholson has been in the business of developing real estate since approximately 1991. Starting in 2006, Nicholson formed the plaintiff limited liability companies to finance and develop eleven Rite Aid pharmacies in Washington and California. The general business model was as follows: defendants[1] would propose and approve construction of a Rite Aid pharmacy in a certain location, identifying Nicholson as the developer. Nicholson, through one of his companies, would acquire property on which to build the pharmacy to defendants' specifications. At some point during the process, defendant Thrifty Payless, Inc., would enter into a written lease agreement for each project with the limited liability company formed for that purpose.[2] Plaintiffs would bear all of the carrying, permitting, and development costs during the build in exchange for Thrifty's agreement to lease the building for a period of twenty years, with options, thereby allowing plaintiffs to recoup their costs and earn a profit.

Plaintiffs assert breach of contract and breach of the covenant of good faith and fair dealing claims against Thrifty arising out of its termination of the leases. The viability of these claims turns, in large part, on the intent of the parties regarding the date on which each

---

[1] Because the contract-based claims at issue in this motion were asserted against only defendant Thrifty Payless, Inc., defendant Rite Aid Corporation is not a moving party. The record shows, however, that both defendants were involved in the underlying events.

[2] The Poulsbo project is an exception: the parties did not reach agreement on a material term, and the lease was never signed.

project was to be delivered to Thrifty. Defendant argues that the delivery date (or range of dates) set forth in each lease was cast in stone and binding on the parties unless and until a written modification of the lease, signed by both parties, was made. Plaintiffs, on the other hand, argue that the specified delivery date (or range of dates) was intended to be a target, to be adjusted by agreement of the parties as the acquisition, permitting, and construction activities proceeded.

The form of the leases at issue changed over time. The first six leases signed – for Blaine, Bremerton, Concord, Everett, Port Angeles, and Silverdale – required plaintiffs to:

> complete Landlord's Work within __ months following the date hereof (the "Delivery Period"). If Landlord fails (for any reason, including *force majeure* events, however excluding Tenant caused delays, in which event the Delivery Period shall be extended one day for each day of delay) to complete Landlord's Work by [] such date, then Tenant may (in addition to any other rights of Tenant under this Lease or available at law or in equity): (i) terminate this Lease on written notice to Landlord, which termination shall be effective on the date which is thirty (30) days from Landlord's receipt of such notice unless during such 30-day period Landlord has completed construction of the Premises . . . .

See, e.g., Decl. of E. Birch Frost (Dkt. # 27), Ex. 15 at ¶ 7. The time periods for completion ranged from twelve to thirty months. The Port Angeles and Silverdale leases remained of this type, but the other four leases were amended so that they and all subsequent leases included the following delivery date provision:

> The Delivery Date shall occur no earlier than __________ and no later than _____________ (the "Anticipated Delivery Date"). Landlord agrees to use diligent efforts to deliver possession of the Leased Premises to Tenant, with Landlord's Work substantially completed, on the Anticipated Delivery Date; and Landlord agrees to provide written notice to Tenant of any delays respecting completion of the Anticipated Delivery Date within five (5) days after becoming award of the cause for delay.

See, e.g., Decl. of E. Birch Frost (Dkt. # 27), Ex. 5 at ¶ 6(i). The Anticipated Delivery Date was

generally set one to three years into the future and lasted for two to four months. A separate termination provision containing essentially the same language as the original form of lease allowed defendant to terminate the lease upon thirty days' notice if plaintiffs failed to complete the landlord's work by the Anticipated Delivery Date (unless the delay were caused by Thrifty). See, e.g., Decl. of E. Birch Frost (Dkt. # 27), Ex. 5 at ¶ 7.

Over the course of the eleven development projects, the parties reported and apparently relied upon delivery and fixture dates that were inconsistent with the dates specified in the leases. Most of these changes were not memorialized in a formal modification or lease amendment, although they were recorded in a computer program maintained by defendants. In May 2008, with six leases already signed, defendants did a "Pipeline Review" and determined that they needed to restructure the development program, pushing back store opening dates and increasing the rents in order to offset the resulting increase in carrying costs. Decl. of Jeffrey M. Thomas (Dkt. # 36), Ex. F.[3] At the time of the "Pipeline Review," the delivery dates for Blaine, Bremerton, and Concord had already been delayed, apparently without a "writing . . . signed by the Landlord and the Tenant." See, e.g., Decl. of E. Birch Frost (Dkt. # 27), Ex. 5 at ¶ 43. For Port Angeles, both the "current" and "potential" store opening dates set forth in the "Pipeline Review" actually preceded the delivery date specified in the lease. In January 2009, defendants requested that the delivery date for the Oakley store, which had already been pushed past the dates specified in the lease, be delayed even further. Decl. of Jeffrey M. Thomas (Dkt. # 36), Ex. N. Plaintiffs, meanwhile, were running into all sorts of financing and permitting issues. They kept Thrifty apprised through biweekly teleconferences during which the parties discussed the progress at each site and defendants' store opening plans and, if necessary, adjusted the date

---

[3] The liquidity crisis related to the burst of the housing bubble in the United States began in the summer of 2007, with most economists agreeing that the economy was in recession by the end of that year.

on which Thrifty would take delivery and begin installing fixtures. Defendants maintained a detailed computerized program, called Site Trak or T-Rex, which identified each project and the proposed, revised, and actual dates on which key development events occurred or were scheduled to occur. Decl. of Jeffrey M. Thomas (Dkt. # 36), Ex. A (11/30/09 T-Rex report), Ex. R (7/24/09 T-Rex report), Ex. V (5/21/09 T-Rex report), Ex. H (4/30/09 T-Rex report), Ex. Q (3/23/09 T-Rex report, and Ex. I (7/29/08 Site Trak report). Following the biweekly meetings, defendants updated these reports to reflect the new dates to which the parties had agreed, then sent the report to plaintiffs in anticipation of the next biweekly meeting.

Plaintiffs did not make delivery on any of the projects by the delivery dates specified in the leases. On June 2, 2009, Thrifty provided written notification of their intent to terminate the lease related to the San Pablo pharmacy "due to the landlord's failure to deliver possession of the premises to us by the outside delivery date set forth in the Lease." Decl. of E. Birch Frost (Dkt. # 27), Ex. 27. The lease included a delivery window of February 2, 2009, to June 2, 2009. According to the March 23, 2009, T-Rex report, however, the project deadlines had been revised such that groundbreaking would not occur until May 2009. The parties apparently estimated a sixteen week build, and defendants revised the dates related to their installation of fixtures, stocking, and store opening accordingly. Although the columns in the T-Rex report do not track the lease in that it does not have a column entitled "Anticipated Delivery Date," the report and the remaining lease terms, when taken in the light most favorable to plaintiffs, shows that the parties agreed to delay the delivery date until approximately November 9, 2009. That was the revised date for fixture installation (*i.e.*, the date on which the landlord's work would be substantially complete and defendants planned to make improvements to the building) and would provide a reasonable period of time after the scheduled groundbreaking and before the store opening date to accomplish all necessary tasks. Thus, there is evidence that, when Thrifty sent the termination letter for San Pablo on June 2, 2009, the parties had previously

agreed to postpone the delivery date until November 2009.

For a number of other projects, the parties apparently agreed to postpone construction indefinitely. They inserted a placeholder store opening date of January 1, 2025, in T-Rex and simply left the fixture and stocking dates blank. The projects were essentially on hold, with the parties hoping that the economy would pick up, producing increased product demand and financing options, at which point they would negotiate a more realistic and timely construction schedule/delivery date. When Thrifty sent termination notices for Concord, Port Angeles, Everett, Blaine, Santa Rosa, Oakley, and Sunnyvale, T-Rex showed that those projects were not scheduled to open until the distant future and that plaintiffs had no pending construction deadlines.

With regards to Poulsbo, the project proceeded in much the same way as the others except that a lease was never signed. Defendants approved the construction of the store in Poulsbo, Nicholson formed an LLC to acquire and develop the property, and progress on the project was recorded in T-Rex. The last entries in the record show that the parties had agreed to a "Fixture Date" of January 24, 2011, and a store opening date of March 10, 2011. Plaintiffs did not, however, provide a statement of the architectural and engineering costs associated with the project: those costs were to be used to calculate the rent on the project. In their absence, a lease was never signed, although Nicholson avers that "[b]oth sides understood that we had a deal in place for approximately $880,000 in rent per year . . . ." Decl. of Brent C. Nicholson (Dkt. # 35) at ¶ 16. In May 2010, plaintiffs were informed that defendants had drafted termination letters for all of plaintiffs' deals and would terminate the leases in the near future. Decl. of Brent C. Nicholson (Dkt. # 35) at ¶ 14.[4] Plaintiffs attempted to renegotiate the terms of the leases in order

---

[4] Thrifty's objections to consideration of statements made at the February and May 2010 meetings are overruled. Federal Rule of Evidence 408 precludes consideration of certain evidence, namely offers or a willingness to compromise a claim and statements made in attempts to settle a claim. Courts regularly find Rule 408 inapplicable, however, where the compromise negotiations, in and of

to save the projects and recoup some of their investment, but discussions broke down on August 12, 2010. Plaintiffs concluded that all of the deals, including Poulsbo, were terminated at that point.

With regards to the Silverdale and Bremerton projects, the latest date shown in T-Rex for the installation of fixtures was June 14, 2010, with a store opening date of July 29, 2010. At a meeting on February 17, 2010, defendants informed plaintiffs that these projects, among others, did not meet defendants' revised return on investment ("ROI") criteria and would be terminated. The parties continued to work toward bringing the projects within the new ROI standards, including the May 2010 meeting described above. The fixture and store opening dates set forth in T-Rex came and went: there is no indication that the parties agreed to any further delays or extensions of the time for delivery of the buildings. Thrifty provided written notification of termination for Silverdale on December 2, 2010, and for Bremerton on December 9, 2010.

Plaintiffs filed this lawsuit in King County Superior Court on June 1, 2012, asserting breach of contract, breach of the covenant of good faith and fair dealing, quantum meruit, promissory estoppel, breach of fiduciary duty, state consumer protection act, and tortious interference claims. Defendants removed based on federal diversity jurisdiction. Thrifty filed this motion seeking dismissal of plaintiffs' contract-based claims.

---

themselves, give rise to a cause of action. For example, conduct or statements made during settlement negotiations will be considered where (a) an insurer's settlement offer is the basis for a bad faith claim, (b) the substance of the discussions are necessary to prove a subsequent breach of the settlement agreement, and/or (c) the negotiations involved threats or other wrongdoing that forms the basis for a claim. See Advisory Committed Notes to 2006 Amendment. If, as plaintiffs allege, defendants chose to terminate their leases at what was nominally billed a "settlement" conference, evidence of that conduct would be admissible when determining whether a breach occurred.

## DISCUSSION

### I. Breach of Contract

Thrifty argues that plaintiffs' breach of contract claim fails as a matter of law because (a) the leases preclude oral modifications of the delivery date, (b) the statute of frauds precludes oral modifications of a multi-year lease, (c) there was no contract related to the Poulsbo project, and (d) Thrifty properly terminated the leases after the delivery date specified in the leases had passed. Each argument is considered below.

#### A. Oral Modification of Delivery Date

Thrifty argues that plaintiffs cannot rely on the revised construction and delivery schedules set forth in T-Rex because the leases contained the following language: "It is expressly agreed . . . that the terms, covenants, conditions and agreements of this Lease cannot be altered, changed, or modified or added to except in writing and signed by the Landlord and the Tenant." There are issues of fact regarding the intent of the parties at the time of contracting, waiver, and materiality that preclude summary judgment on this ground.

##### (1) Interpretation of Delivery Period and Anticipated Delivery Date

Defendant's argument – that the lack of a formal modification, signed by both parties, means that the dates or ranges of dates set forth in the leases control – presumes that the various Delivery Periods or Anticipated Delivery Dates were fixed covenants, such that a modification of the agreement was necessary to make any adjustment to the construction schedule. What the parties intended when they established a Delivery Period or an Anticipated Delivery Date is an open question, however. Was the date fixed and set in stone, as defendants argue, and therefore subject to the "no oral modifications" provision? Or did the parties intend the date to be a target, a preliminary schedule, subject to on-going negotiation and frequent informal alteration as the development process unfolded?

Under Washington and California law, contract language must be interpreted to

reflect the parties' intent at the time of contracting. See, e.g., Berg. v. Hudesman, 115 Wn.2d 657, 663 (1990) (quoting A. Corbin, The Interpretation of Words and the Parol Evidence Rule, 50 Cornell L. Quar. 161, 162 (1965)); Cal. Civil Code § 1636. "Determination of the intent of the contracting parties is to be accomplished by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." Stender v. Twin City Foods, Inc., 82 Wn.2d 250, 254 (1973). See also Morey v. Vannucci, 75 Cal. Rptr.2d 573, 578 (Cal. App. 1998). Extrinsic evidence regarding the context in which the contract was made is admissible as an aid in ascertaining the parties' intent. Berg, 115 Wn.2d at 667 (adopting the Restatement (Second) of Contracts §§ 212, 214(c) (1981)); Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 442 P.2d 641 (Cal. 1968).

There is ample evidence from which one could conclude that the parties intended the Anticipated Delivery Dates contained in the Concord, Bremerton, Everett, Blaine, San Pablo, Santa Rosa, Oakley, and Sunnyvale leases to be an estimate or guide that was subject to change as the project progressed. The contract does not expressly make time of the essence. To the contrary, after setting forth an "anticipated" delivery date which spanned a period of months, the lease simply requires plaintiffs to use "diligent efforts" to make timely delivery and provides a notice mechanism if a delay arises. While the lease makes the failure to deliver the project by the Anticipated Delivery Date cause for termination, the possibility that the date would be adjusted is clearly contemplated: if that were the intent of the parties, the nature of the undertaking and the contract as a whole suggest that a corresponding delay in the right to terminate would arise. The conduct of the parties after contracting also supports an interpretation of Anticipated Delivery Date that makes the specified range of dates a target to be adjusted by simple agreement of the parties. The parties met regularly to discuss the projects so

that all parties were aware of problems and scheduling issues as they arose, both sides proposed and agreed to changes in the delivery date without resorting to a formal lease amendment or modification, the agreed-upon revisions were recorded in T-Rex and relied upon by the parties as the development progressed, and formal modifications occurred only when required by a third party that did not have access to T-Rex.[5] Because there is an issue of fact regarding the intended interpretation of paragraph 6(i) of the leases for Concord, Bremerton, Everett, Blaine, San Pablo, Santa Rosa, Oakley, and Sunnyvale, Thrifty is not entitled to summary judgment on the breach of contract claim for those projects.

The leases for Silverdale and Port Angeles were materially different, however. These leases (and the first version of the leases for Concord, Bremerton, Everett, and Blaine) specified the period in which delivery was to occur without modifiers such as "anticipated" and without any suggestion that delays were expected or would be accommodated through a simple notice process. Assuming the factfinder finds in favor of Thrifty on the contract interpretation issue in the Silverdale and Bremerton leases, one could argue that the "no oral modifications" provision invalidates the parties' informal attempts to adjust the delivery dates through T-Rex and that the original delivery dates remained in place. The issues then become whether Thrifty waived the "no oral modification" provision and/or whether the failure to complete the landlord's work within the specified Delivery Period was a material breach justifying termination.

**(2) Waiver**

The Court will assume, for purposes of this part of the analysis, that the parties intended at the time of contracting that the delivery date, whether described as a Delivery Period

---

[5] Thrifty correctly points out that extrinsic evidence cannot be used to add to, modify, or contradict the terms of a written contract. J.W. Seavey Hop Corp. v. Pollock, 20 Wn.2d 337, 348-49 (1944). In the circumstances presented here, however, the evidence of the biweekly meetings and other conduct of the parties is being used to interpret the term Anticipated Delivery Date in the first instance.

or an Anticipated Delivery Date, be set in stone and could be modified only by a writing signed by both parties. Nevertheless, a party may subsequently waive contractual provisions made for its benefit, and may do so through express declaration or through conduct. Either way, the party asserting a waiver must establish that the waiver was intentional: mere negligence or oversight will not waive a contractual provision. Reynolds Metals Co. v. Elec. Smith Constr. & Equip. Co., 4 Wn. App. 695, 700 (1971); Waller v. Truck Ins. Exchange, Inc., 900 P.2d 619, 636 (Cal. 1995). In the circumstances presented here, the jury could find that Thrifty either intended to effect a change in the delivery dates without formal modification (through the T-Rex report) or intended to mislead plaintiffs into believing that such a change had been made while secretly intending to enforce the original delivery dates. If the former, there would be a waiver of the "no oral modification" provision: despite full awareness of the contractual provision requiring a modification to be in writing and signed by both parties, Thrifty regularly ignored that requirement to alter the schedule. If the latter, plaintiffs may not have a breach of contract claim, but other claims, such as breach of the covenant of good faith and fair dealing or estoppel, might be available. What Thrifty intended when it repeatedly agreed to extend construction deadlines without going through a formal modification process is for the jury to decide.

**(3) Materiality**

If the Court assumes that the parties intended that the delivery dates set forth in the leases were immutably fixed and that there was no waiver of the "no oral modifications" provision, plaintiffs could still prevail by showing that the failure to deliver by the original date was not a material breach. Materiality is an issue of fact that depends upon the circumstances of each case. Jacks v. Blazer, 39 Wn.2d 277 (1951); Vacova Co. v. Farrell, 62 Wn. App. 386, 402-03 (1991). See also Superior Motels, Inc. v. Rinn Motor Hotels, Inc., 241 Cal. Rptr. 487, 495 (Cal. App. 1987) ("Where the line is drawn between important and the trivial [breach] cannot be settled by a formula. . . . The same omission may take on one aspect or another according to its

setting.") (quoting 2 Williston on Contracts § 841). In determining the materiality of a breach, the factfinder should consider:

> (1) whether the breach deprives the injured party of a benefit which he reasonably expected, (2) whether the injured party can be adequately compensated for the part of that benefit [of] which he will be deprive, (3) whether the breaching party will suffer a forfeiture by the injured party's withholding of performance, (4) whether the breaching party is likely to cure his breach, and (5) whether the breach comports with good faith and fair dealing.

Bailie Commc'ns, Ltd. v. Trend Bus. Sys., 53 Wn. App. 77, 83 (1988) (citing Restatement (Second) of Contracts § 241 (1981)). See Sackett v. Spindler, 56 Cal. Rptr. 435, 441 (Cal. App. 1967) (adopting similar test set forth in Restatement (Second) of Contracts § 275). The situation of the parties must be viewed "as of the time for performance and in terms of the actual failure." Bailie, 53 Wn. App. at 83 (quoting Restatement (Second) of Contracts § 237 cmt. b (1981)). In the context of this case, where the parties acted as if the delivery date were a movable target and Thrifty repeatedly agreed to alterations and modifications of the dates, a reasonable jury could determine that failure to deliver the project by the date set forth in the original contract was not a material breach and did not discharge defendant's obligations under the contract.

**B. Statute of Frauds**

The purpose of the statute of frauds is "the prevention of fraud arising from uncertainty inherent in oral contractual undertakings. Where no uncertainty exists in the oral agreement, the reason for the statute's application similarly disappears." Miller v. McCamish, 78 Wn.2d 821, 829 (1971). For all projects other than Poulsbo, Thrifty acknowledges that the leases and amended leases attached to the Declaration of E. Birth Frost (Dkt. # 28) satisfy the statute of frauds. Defendant argues, however, that the statute of frauds makes the lease modifications asserted by plaintiffs and reflected in the T-Rex reports invalid and unenforceable. The revisions to the construction schedule, including the dates by which defendants would have access to the buildings, were reduced to writing and are contained in defendants' computerized

tracking program. Defendants not only recorded the changes made by the parties at the biweekly meetings, they also distributed the revisions to the parties as the basis for the on-going projects. Defendants do not deny that they agreed to the changes, created the reports, sent them to plaintiffs via company emails, or intended that the parties rely on them. Their argument apparently boils down to the contention that the modified dates, which defendants reduced to writing and to which they objectively manifested their assent, should have no legal effect because they did not take pen to paper and "sign" the T-Rex report.

The type of ambiguities that are inherent in oral undertakings are not at issue in this case. Nor is there any real issue regarding defendant's intent: in the chosen medium of communication, handwritten signatures, whether original or digital, are rarely used. By affixing a typed name on the cover email, defendant announced its adoptions of the contents of the T-Rex report and authenticated the attached writing. See Marks v. Walter G. McCarty Corp., 205 P.2d 1025, 1028 (Cal. 1949) ("The statute of frauds does not demand that the signature of the party to be charged be placed at the end of the writing relied upon if a proper signature be found elsewhere on the instrument. Furthermore the signature need not be manually affixed, but may in some cases by printed, stamped or typewritten. But it is a universal requirement that the statute of frauds is not satisfied unless it is proved that the name relied upon as a signature was placed on the document or adopted by the party to be charged with the intention of authenticating the writing. In other words the defendant must intend to appropriate the name as a signature.") (internal citations omitted).

There being no ambiguity as to the parties' mutual agreement to the revisions set forth in the T-Rex report or the content of the revised terms, the Court finds the statute of frauds satisfied as to Concord, Silverdale, Bremerton, Port Angeles, Everett, Blaine, San Pablo, Santa Rosa, Oakley, and Sunnyvale.

**C. Poulsbo**

The same analysis does not apply to Poulsbo, however. Although a draft lease was exchanged between the parties, a key term – the rent to be paid upon delivery of the building – had not been agreed upon. That term was not supplied by later modifications and cannot be supported by parol evidence without eviscerating the statute of frauds: there would be too much potential for fraud if one could bind an opposing party to twenty years of rental payments at an amount of his choosing based on nothing more than an intent to negotiate a reasonable rent in the future. Smith v. Twohy, 70 Wn.2d 721, 725 (1967) (in order to satisfy the statute of frauds, the writing must "be so complete in itself as to make recourse to parol evidence unnecessary to establish any material element of the undertaking."); Pruitt v. Fontana, 300 P.2d 371, 379 (Cal. App. 1656) ("Where material or essential terms of a contract within the statute of frauds are not reasonably expressed in a note or memorandum, their absence may not be supplied by parol.").

Because there was never agreement to a material term of the alleged contract, the doctrine of "part performance" cannot save plaintiffs' contract claims related to Poulsbo. The problem is not that the parties failed to unequivocally indicate their assent to an agreement in writing: they actually failed to agree. Both sides knew that additional information would be necessary to resolve the outstanding issue of the amount of rent to be paid for the Poulsbo store. Because an agreement had not, in fact, been reached, plaintiffs cannot argue that they partly performed because they thought they had a valid, though technically unenforceable, contract. Plaintiffs have not proven and were not relying on the existence of an oral agreement. The doctrine of part performance is therefore not applicable. Pac. Cascade Corp. v. Nimmer, 25 Wn. App. 552, 559 (1980); Sutton v. Warner, 15 Cal. Rptr.2d 632, 636 (Cal. App. 1993). Plaintiffs' breach of contract claim related to Poulsbo fails as a matter of law.

**D. Expiration of Delivery Periods**

As discussed above, there are genuine issues of material fact regarding the intent of the parties with regards to the delivery dates specified in the leases, waiver, and the materiality of any breach. If these issues are decided in plaintiffs' favor, the leases were modified by the parties and the delivery dates were extended as set forth in T-Rex. For most of the projects, the modified delivery date had not passed when defendants terminated the agreements. Plaintiffs' breach of contract claim regarding Concord, Port Angeles, Everett, Blaine, San Pablo, Santa Rosa, Oakley, and Sunnyvale may therefore proceed.

With regards to Silverdale and Bremerton, however, the last T-Rex report in the record shows a fixture date of June 14, 2010, and a store opening date of July 29, 2010. These dates came and went before defendants issued their notices of termination in December 2010. Plaintiffs argue, however, that Thrifty anticipatorily repudiated the leases for Silverdale and Bremerton when they announced in February 2010 that they were going to terminate the leases because they did not meet defendants' revised ROI criteria and/or when they stated in May 2010 that the termination letters had been drafted. Although anticipatory repudiation is an issue of fact, there must be a clear and positive statement or action that expresses an intent not to perform under the contract. Wallace Real Estate Inv., Inc. v. Groves, 124 Wn.2d 881, 898 (1994). In the circumstances presented here, the parties clearly contemplated that some additional step would be necessary to affect a termination, namely the delivery of termination letters and the passage of the thirty-day cure period. Plaintiffs have not raised a genuine issue of fact regarding the dates on which the Silverdale and Bremerton projects were terminated. In the absence of a viable theory of breach given that the December 2010 termination letters were sent after the projects should have been completed, plaintiffs' breach of contract claim related to Silverdale and Bremerton fails as a matter of law.

**II. Breach of the Covenant of Good Faith and Fair Dealing**

Defendant argues that there is no independent claim for breach of the covenant of good faith and fair dealing under either Washington or California law. Defendant is wrong. Every contract carries with it an implied covenant of good faith and fair dealing that obligates the parties to cooperate with one another so that each may obtain the full benefit of the bargain. Badgett v. Sec. State Bank, 116 Wn.2d 563, 569 (1991); City of Hollister v. Monterey Ins. Co., 81 Cal. Rptr.3d 72, 100 (Cal. App. 2008). While it is true that the obligation arises only in the context of an existing contract, a breach of the duty of good faith and fair dealing gives rise to a separate and independent cause of action that is regularly heard by the courts of those states. See Frank Coluccio Constr. Co., Inc. v. King County, 136 Wn. App. 751, 764-66 (2007); Pasadena Live, LLC v. City of Pasadena, 8 Cal. Rptr.3d 233 (2004).

Plaintiffs have produced evidence from which one could conclude that Thrifty undertook a course of action which, while not an actual breach of an express contractual obligation, was designed and intended to deprive plaintiffs of the full benefit of performance. Thrifty's arguments suggest that, despite agreeing to alter delivery dates and affirmatively stating that plaintiffs had additional time in which to acquire property, obtain financing, and complete the landlord's work, defendants secretly intended to hold plaintiffs to the original dates. Thrifty did not have to extend the delivery dates: if time were of the essence or it otherwise needed the projects delivered as scheduled, it could have insisted on compliance with the leases as written. It did not. The record currently before the Court would support a finding that Thrifty's actions were not necessary to the protection of its own interests, were detrimental to plaintiffs, and were unfair and in bad faith. Plaintiffs' implied covenant claims may proceed.[6]

---

[6] Although not argued by defendant, plaintiffs are unlikely to succeed on their good faith and fair dealing claim regarding the Poulsbo, Silverdale, and Bremerton projects. In the absence of a contract regarding the Poulsbo site, the implied duties did not arise. Keystone Land & Dev. Co. v. Xerox Corp., 152 Wn.2d 171, 177 (2004). With regards to Silverdale and Bremerton, even if Thrifty

## CONCLUSION

For all of the foregoing reasons, Thrifty's motion for summary judgment (Dkt. # 25) is GRANTED in part and DENIED in part. Plaintiffs' breach of contract claim regarding Poulsbo, Silverdale, and Bremerton is hereby DISMISSED. Their other contract-based claims against Thrifty may proceed.

Dated this 18th day of February, 2014.

Robert S. Lasnik
United States District Judge

misled plaintiffs into believing that they had until June 2010 to make the projects available for tenant improvements, plaintiffs were actually given the additional time and still could not substantially complete the landlord's work. It is doubtful that plaintiffs will be able to establish any harm from the alleged breach of the covenant of good faith and fair dealing.