UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                    )
BRENT NICHOLSON, *et al.*,          )
                                    )   No. C12-1121RSL
            Plaintiffs,             )
    v.                              )   ORDER GRANTING
                                    )   DEFENDANTS' MOTION FOR
THRIFTY PAYLESS, INC., *et al.*,    )   SUMMARY JUDGMENT
                                    )
            Defendants.             )
_____ )

       This matter comes before the Court on "Defendants' Motion for Summary Judgment." Dkt. # 88. Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude the entry of judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." Krechman v. County of Riverside, 723 F.3d 1104, 1109 (9th Cir. 2013). Although the Court must reserve for

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

the jury genuine issues regarding credibility, the weight of the evidence, and legitimate inferences, the "mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient" to avoid judgment. City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1049 (9th Cir. 2014); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 925 (9th Cir. 2014). In other words, summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties and having heard the arguments of counsel, the Court finds as follows:

**A. Judicial Estoppel**

On April 22, 2010, plaintiff Brent Nicholson and his wife filed for bankruptcy protection under Chapter 11. Although the bankruptcy proceeding was filed by the individuals, it was clear that the bulk of the couple's assets and liabilities were tied up in the various LLCs Nicholson had created to own and develop properties. In an amended schedule of assets filed on June 18, 2010, Nicholson disclosed six of the LLCs that are plaintiffs in this litigation and reported that his interest in the LLCs had a current value of $0.00. With regards to these six projects, Nicholson explained that each of the entities was "completely underwater based on the value of the property and the amount of secured debt." Nicholson Dep., Ex. 408 at ¶ 14. Defendants had not yet issued termination notices as to these six projects and have not shown that the valuation analysis was defective at the time it was made.

Nicholson did not, however, disclose the existence of the other four plaintiff LLCs, namely San Pablo Cruise, Oakley Dokley, Holy Rose, or Sunnyboy, and did not assign a value thereto. At the time the June 18, 2010, schedule was filed, defendants had already issued

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -2-

1  termination notices as to the San Pablo and Oakley projects. Plaintiffs have not attempted to
2  explain why they failed to disclose companies in which Nicholson had a substantial interest
3  (85% ownership) or why they failed to disclose the potential claims San Pablo Cruise and
4  Oakley Dokley had against Rite Aid.

5          On June 8, 2011, Nicholson filed a "Periodic Report" disclosing all ten of the
6  plaintiff LLCs and the percentage interest he owned in each entity. No statements regarding the
7  LLCs' values or the value of the debtors' interests in the entities were provided. Nicholson
8  simply noted the date on which the LLCs had lost or soon would lose control of each property
9  and stated that the LLCs would be filing a lawsuit against Rite Aid Corporation.[1] Defendants
10 had terminated all of the leases at that point.

11         The Disclosure Statement issued to all creditors and other interested parties who
12 would have to decide whether to accept or reject the debtor's proposed plan of reorganization
13 again failed to disclose the existence of San Pablo Cruise, Oakley Dokley, Holy Rose, or
14 Sunnyboy. Plaintiffs rely on a reference in the Disclosure Statement to the June 8, 2011, filing
15 to fill the void, but offer no explanation for why these assets were not affirmatively disclosed in
16 this important document. With regards to the six LLCs that were disclosed, Nicholson justified
17 a valuation of $0.00 using the following analysis:

> The values have been determined by the Debtors based on their opinion of the
> market value of the limited liability company interests. This opinion has been
> based on information supplied by real estate and business brokers, but the Debtors
> have not hired any appraisers to make the determinations. In general the
> calculation of the market value was made based on an analysis of the gross value
> of the underlying assets owned by each entity less the outstanding debt owed by
> the entity. The Debtors' percentage interest in that net value figure for the entity is
> then further discounted based on application of traditional marketability and

---

[1] Although Full to the Brem, LLC, and Nicholson's interest therein is disclosed in a chart on page 2 of the report (Decl. of Richard G. Birinyi (Dkt. # 92), Ex. 2), the Court has been unable to locate a form "Valuation Estimate" for that entity.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -3-

> minority interest adjustments because any person buying the Debtors' interest in a limited liability company would become only the owner of an economic interest and would have no right to participate in management of any of the entities.

Decl. of Richard G. Birinyi (Dkt. # 92), Ex. 3 at 12.  This valuation methodology appears to be faulty in a number of respects, one of which is relevant to the judicial estoppel analysis.  Nicholson fails to disclose, much less take into consideration, the claims asserted in this litigation.  The methodology simply tallies up the assets owned by each LLC minus its outstanding debts.  The only reference to a potential claim is found in a separately-filed document, the June 8, 2011, report, that itself contains no information regarding the nature or value of the claim.[2]

The Liquidating Plan of Reorganization approved by the Honorable Karen A. Overstreet, United States Bankruptcy Judge, on August 8, 2011, again fails to disclose the existence of San Pablo Cruise, Oakley Dokley, Holy Rose, or Sunnyboy and the claims asserted in this litigation.  Decl. of Richard G. Birinyi (Dkt. # 92), Ex. 8.  The plan recognizes that the six disclosed LLCs, defined as "Exempt Asset Entities" in Schedule 2.26 of the plan, may have undefined "Damage Claims" against third parties, but abandons those claims to Nicholson in exchange for 10% of his share of any "Net Entity Litigation Proceeds" obtained in litigation.[3]

---

[2] The method for calculating Nicholson's personal interest in the assets of each LLC is also unlikely to generate an accurate valuation of the disclosed LLCs.  First, Nicholson failed to acknowledge his right to recover loans or advances made to the entities in his personal capacity.  Second, Nicholson apparently discounted his ownership interests in each LLC by 80% on the unsupported supposition that funds could not be accumulated by the Liquidating Trustee for disbursement to creditors unless there were a sale of the ownership interest in the LLC.

[3] Counsel for the Trustee interpreted the plan of organization as precluding the Trustee from directly pursuing claims held by the Exempt Asset Entities.  Decl. of Daniel R. Merkle (Dkt. # 93) at ¶ 7.  Although one could argue that ¶ 7.12 of the plan contemplates that the term "Damage Claims" includes claims held by the Exempt Asset Entities and gave the Liquidating Trustee the option of directly pursuing those claims for the benefit of the creditors or abandoning those claims, the Trustee apparently believed that the claims asserted herein had been abandoned to the debtors upon

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT           -4-

1     "Judicial estoppel is an equitable doctrine that precludes a party from gaining an
2  advantage by asserting one position, and then later seeking an advantage by taking a clearly
3  inconsistent position." Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir.
4  2001). "In the bankruptcy context, the federal courts have developed a basic default rule:  If a
5  plaintiff-debtor omits a pending (or soon-to-be-filed) lawsuit from the bankruptcy schedules and
6  obtains a discharge (or plan confirmation), judicial estoppel bars the action." Ah Quin v. County
7  of Kauai Dept. of Transp., 733 F.3d 267, 271 (9th Cir. 2013).  Such a rule generally comports
8  with the Supreme Court's analysis in New Hampshire v. Maine, 532 U.S. 742 (2001), because
9  the positions taken are inconsistent ("there is not a claim" vs. "there is a claim"), the bankruptcy
10  court accepted the prior representation (by allocating resources, discharging debts, and/or
11  reorganizing debtors in reliance thereon), and the debtor obtained an unfair advantage (creditors
12  did not have a chance to assess and benefit from the undisclosed assets before discharge or
13  reorganization). Ah Quin, 733 F.3d at 271.  Barring litigation of claims that were not disclosed
14  in bankruptcy also furthers the underlying goal of judicial estoppel, which is "to protect the
15  integrity of the judicial process" by prohibiting parties from "playing fast and loose with the
16  courts." New Hampshire, 532 U.S. at 749-50; Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir.
17  1990).

18     Plaintiffs argue that (1) there were no inconsistent statements because all ten LLCs
19  and their potential claims were disclosed in the June 8, 2011, report; (2) Nicholson's valuation of
20  his interests in the LLCs was reasonable; (3) neither the presiding judge nor the Liquidating
21  Trustee was misled regarding the existence and nature of the claims asserted in this litigation; (4)
22  a final decree has not been entered in the bankruptcy proceeding and the bankruptcy court
23  retains jurisdiction to ensure that the purposes and intent of the plan are carried out; (5) plaintiffs
24
25  ──────────────
26  confirmation.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT          -5-

have not obtained an unfair advantage in this litigation; and (6) it would be unfair to the LLCs, Nicholson's partners, and the bankruptcy creditors to invoke judicial estoppel.  Each argument is considered below.

**(1)  Adequacy of Disclosures in Bankruptcy Proceeding**

The bankruptcy code places an affirmative duty on the debtor to carefully, completely, and accurately schedule his assets and liabilities.  See 11 U.S.C. § 521(1); Cusano v. Klein, 264 F.3d 936, 945-46 (9th Cir. 2001).  Nicholson repeatedly and without explanation failed to disclose four LLCs in which he had a substantial interest, repeatedly and without explanation failed to disclose the claims asserted in this litigation, and, in the one document where the LLCs and the potential lawsuit were disclosed, made no attempt to value the claims.  Even if the June 8, 2011, periodic report contained a full, fair, and accurate disclosure of Nicholson's personal interests in the claims asserted here (it did not), such a disclosure was buried amidst hundreds of other documents in which he was not so forthcoming.  Nicholson filed key documents, including schedules, disclosure statements, and the plan itself, that contained statements inconsistent with the claims asserted in this litigation, all the while knowing that his creditors and the bankruptcy court would rely on those documents when evaluating the debtors' ability to make good on his debts.  See Hamilton, 270 F.3d at 784 (providing notification of claims to the trustee by mail or otherwise is insufficient where debtor "is required to have amended his disclosure statements and schedules to provide the requisite notice, because of the express duties of disclosure imposed on him by 11 U.S.C. § 521(1), and because both the court and [his] creditors base their actions on the disclosure statements and schedules.").  Nicholson's repeated failures to disclose the existence of four of the plaintiff LLCs and/or the claims asserted in this litigation are inconsistent statements for purposes of the judicial estoppel analysis.

**(2)  Reasonableness of Valuation**

Plaintiffs argue that the $0.00 valuation assigned to the six disclosed LLCs (and to

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT           -6-

all of the plaintiff LLCs in the June 8, 2011, periodic report) was appropriate because (a) the value of the property owned by each LLC was less than its outstanding debt and (b) it is a common practice to assign high stakes litigation zero value and leave it to the creditors, trustee, and/or court to investigate the actual value of the claims.  With regards to the first argument, the issue is not whether the assets on each LLC's books were greater or less than its debts, but whether Nicholson appropriately accounted for the existence of the LLC's known claims against defendants.  He did not.  As for the second argument, plaintiffs seem to be arguing that a debtor can arbitrarily value an unliquidated claim because, once the existence of the claim is disclosed, the obligation to investigate and accurately value the asset is foisted onto the other parties in the bankruptcy proceeding.  While a perfect valuation of a potential claim cannot be expected or demanded (see Ingram v. Thompson, 141 Wn. App. 287, 293 (2007)), a good faith effort based on the debtors' familiarity with the facts giving rise to the cause of action is necessary to effectuate the purposes of the disclosure requirements.  "Causes of action are separate assets which must be formally listed" and valued on the schedules.  Cusano, 264 F.3d at 947.  A debtor cannot affirmatively state that a claim has no value, rather than that the value is unknown, on the assumption that someone else will figure out that the statement is a lie.  See Harris v. Fortin, 183 Wn. App. 522, 333 P.3d 556, 560 (2014).  In this case, Nicholson ignored the existence of the claims entirely and did not even attempt to calculate their value before announcing that the LLCs were worthless.  Such "valuation" is not reasonable.

**(3)  Knowledge of the Court and the Liquidating Trustee**

Plaintiffs argue that the bankruptcy court was aware of the claims that were subsequently asserted in this litigation and did not, therefore, accept Nicholson's prior inconsistent omissions and statements.  To the extent plaintiffs are relying on the June 8, 2011, periodic report as the source of Judge Overstreet's supposed knowledge, the argument fails.  As noted above, a disclosure in a single, unremarkable document is insufficient under the

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT           -7-

Bankruptcy Act, especially where the disclosure has been excluded from the documents on which judges, creditors, and trustees typically rely. The June 8, 2011, periodic report does not give rise to a reasonable inference of knowledge in the circumstances presented here. Plaintiffs provide no other evidence suggesting that Judge Overstreet was told or otherwise knew about these claims before she confirmed the debtors' proposed plan of reorganization on August 8, 2011. There is some indication that the Liquidating Trustee had additional information regarding the existence and nature of the claims, but it is unclear what the Liquidating Trustee was told. In addition, any additional information seems to have been disclosed in meetings held after the plan of reorganization was confirmed by Judge Overstreet, and there is no indication that she was aware of any additional information before confirming the plan. The only reasonable inference from the record is that Nicholson succeeded in persuading Judge Overstreet that the LLCs had no viable claims arising out of the termination of the lease agreements and/or that any potential claims were worthless.

### (4)  Bankruptcy Court Retains Jurisdiction

Plaintiffs argue that, because a final decree has not yet been entered, any disputes regarding the appropriate allocation of Net Entity Litigation Proceeds can be determined by the bankruptcy court. Even if the Court were to assume that the presiding bankruptcy judge has the power to rewrite the terms of the plan to require Nicholson to turn over something more than 10% of the net proceeds from the litigation or to add entities to Schedule 2.26, preventing a party from gaining an unfair advantage is only one of the goals of the doctrine of judicial estoppel. Courts also invoke judicial estoppel in order to promote the orderly administration of justice, to protect the dignity of judicial proceedings, and to ensure that those who game the system are not rewarded. See Hamilton, 270 F.3d at 782. The fact that the bankruptcy judge might, if the issue were properly raised in the future, reform the order of confirmation to take the newly disclosed information into account is of little solace. Nicholson has not moved to reopen the bankruptcy

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -8-

proceeding to correct the disclosures, and a reevaluation of the reorganization plan remains unlikely.  Plaintiffs are currently prosecuting inconsistent claims for millions of dollars before this Court, which must therefore decide whether those claims should be permitted to go forward. If the relevant factors tip in favor of estoppel, the mere possibility that another court may yet be able to undo the systemic harm Nicholson has caused will not stay this Court's application of the doctrine.

### (5) Unfair Advantage or Detriment in this Litigation

The unfair advantage that is relevant to the judicial estoppel analysis is not, as plaintiffs would have it, an advantage in the second litigation.  As recently discussed by the Ninth Circuit, a debtor receives an unfair advantage from a misrepresentation or omission when it obtains a discharge or plan confirmation without giving creditors a fair opportunity to lay claim to the hidden assets.  <u>Ah Quin</u>, 733 F.3d at 271.  In this case, Nicholson failed to disclose the existence of four LLCs in which he had an 85% interest, failed to disclose that the ten plaintiff LLCs had claims arising out of the lease terminations, and made no attempt to value those claims at any stage of the bankruptcy proceeding.  The creditors had no reason to suspect that by agreeing to the plan proposed by the debtors, the multi-million dollar claims of San Pablo Cruise, Oakley Dokley, Holy Rosa, and Sunnyboy (the LLCs excluded from the list of Exempt Asset Entities) would automatically revert back to Nicholson[4] or that they were limiting themselves to 10% of the substantial recovery now sought by the other six LLCs.  Nicholson downplayed his assets and obtained a plan of reorganization based on falsehoods of omission. He has been unfairly advantaged vis-à-vis his creditors.

---

[4] Nicholson has apparently stated in discovery that he will turn over 10% of any and all net proceeds from this litigation to the Liquidating Trustee, despite the fact that only six of the ten plaintiff LLCs are on Schedule 2.26 of the plan.  Nevertheless, the plan itself does not require such generosity: the undisclosed LLCs are not "Exempt Asset Entities" required to turn over 10% of their share of the "Net Entity Litigation Proceeds."  Pursuant to ¶ 7.1 of the plan of reorganization, these hidden assets revested in the debtors upon confirmation.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -9-

**(6) Privity and Fairness**

Plaintiffs argue that, on balance, the Court should not use its equitable powers to bar the claims asserted in this litigation because to do so would be unfair to the LLCs (none of which made representations in Nicholson's personal bankruptcy proceeding), Nicholson's partners (who generally hold a minority interest in the LLCs), and Nicholson's creditors (who currently stand to recover 10% of any net litigation proceeds obtained by Full to the Brem, High Ho Silverdale, NMP Concord II, No One to Blaine, The Right Angeles, and Whateverett). The argument regarding the LLCs and their other investors is based solely on the fact that the LLCs "were not parties to the Nicholson bankruptcy." Dkt. # 91 at 9. Estoppel doctrines are generally applied "not only against actual parties to prior litigation, but also against a party that is in privity to a party in a previous litigation." Wash. Mut., Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). When a person owns most or all of the shares in a corporate entity and controls its affairs, there is a presumption that the entity and the individual have a commonality of interest and, therefore, privity. In re Gottheiner, 703 F.2d 1136, 1140 (9th Cir. 1983). Plaintiffs do not dispute that Nicholson had a significant majority interest in eight of the ten LLCs, managed the business affairs of the LLCs, and acted as their virtual representative in both an operational and a litigation capacity. "Because the doctrine of judicial estoppel is intended to protect the courts, we are particularly mindful that the '[i]dentity of parties is not a mere matter of form, but of substance.'" Milton H. Green Archives, Inc. v. Marilyn Monroe, LLC, 692 F.3d 893, 996 (9th Cir. 2012) (quoting Chicago, Rock Island & Pac. Ry. Co. v. Schendel, 270 U.S. 611, 620 (1926)). In the circumstances of this case, it is not unfair to bind the LLCs and their minority members by Nicholson's acts. See Lia v. Saporito, 909 F. Supp.2d 149, 178-79 (E.D.N.Y. 2012) (applying judicial estoppel to bar LLC's claim because the claim was inconsistent with its managing member's prior representations).

Fairness to the creditors is, of course, a concern in the judicial estoppel analysis in that courts typically consider whether the debtor gained an unfair advantage over them in the bankruptcy proceeding. Where an asset is hidden or grossly undervalued in the schedules resulting in a discharge of debts and the abandonment of the asset back to the debtor, the creditors are undoubtedly harmed.[5] This case is different, however, because the plan of reorganization gives the creditors a continuing, albeit modest, interest in the claims of six of the LLCs. Thus, allowing the claims to go forward may result in a recovery for the creditors, whereas barring the claims ensures that the creditors receive nothing. As was the case in Ah Quin, if the Court does not permit this civil action to go forward, the creditors lose out while defendants, who allegedly breached various obligations to the LLCs, are relieved of the responsibility to defend and/or pay the consequences for their actions. 733 F.3d at 275.

While the Court is reluctant to deprive the creditors of their only chance of recovering any assets related to the plaintiff LLCs, the balance of the interests and equities at stake nevertheless suggests that estoppel is appropriate. Nicholson's omissions and misstatements before the bankruptcy court were clearly inconsistent with his position in this

---

[5] In Biesek v. Soo Line R.R. Co., 440 F.3d 410, 413 (7th Cir. 2006), Judge Easterbrook challenges this basic presumption, arguing that using judicial estoppel to wipe out a claim is "another blow on the victims of bankruptcy fraud," *i.e.*, the creditors, and is not an equitable application of the doctrine. "Instead of vaporizing assets that could be used for the creditors' benefit, district judges should discourage bankruptcy fraud by revoking the debtors' discharges and referring them to the United States Attorney for potential criminal prosecution." Id. Judge Easterbrook did not follow his own suggestion in that case, however, nor has undoing bankruptcy discharges or plan confirmations become the remedy of choice in other courts. (The Ninth Circuit has noted that where *the debtor* moves to reopen the bankruptcy proceedings and correct the prior misstatements, the integrity of the judicial system remains intact and judicial estoppel may not be appropriate. Ah Quin, 733 F.3d at 275-76. As far as the record shows, Nicholson has not made any attempt to correct the underlying bankruptcy record in this case.) At a later point in the Biesek opinion, Judge Easterbrook notes that, if the trustee had abandoned a seemingly worthless or low value asset to the debtor who then seeks to bring suit in his or her own name, "*[t]hen* it would have been necessary to consider judicial estoppel." Id. (emphasis in original). That is exactly the situation we have here.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT           -11-

litigation, they were accepted by the bankruptcy court, and they bestowed upon Nicholson an unfair advantage. New Hampshire, 532 U.S. 750-51. These factors tip the balance of equities decidedly in favor of barring Nicholson's efforts to collect millions of dollars in this action. On the other side of the scale is the fact that the creditors will lose the chance to recover 10¢ on the dollar if Full to the Brem, High Ho Silverdale, NMP Concord II, No One to Blaine, The Right Angeles, or Whateverett succeed on their claims (after litigation costs are deducted and other members of the LLCs are paid). "[T]he doctrine of judicial estoppel is concerned with the integrity of the courts, not the effect on parties," however. Ah Quin, 733 F.3d at 275. By hiding claims in the amount of $59,000,000 (with a personal interest of approximately $40,000,000), Nicholson was able to convince the creditors and the bankruptcy court to approve his proposed plan of reorganization. The fact that the plan gives the creditors a small interest in this litigation should not be enough to excuse or insulate the intentional and remarkably inconsistent statements at issue here. Either the bankruptcy court was misled or this Court is being misled. Nicholson cannot have it both ways. Having failed to reopen the bankruptcy proceeding to correct the asset valuation, he is estopped from taking a position in this litigation that is inconsistent with that on which Judge Overstreet relied in confirming his plan of reorganization.

**B. Breach of Contract and Good Faith and Fair Dealing Claims**

In the alternative, the Court finds that plaintiffs' contract-based claims fail as a matter of law. Plaintiffs allege that, by issuing the various termination letters, defendants positively and unequivocally repudiated any intent to perform their obligations under the lease agreements. An anticipatory repudiation releases the other party from any obligation to perform or tender performance under the contract. Refrigeration Eng'g Co. v. McKay, 4 Wn. App. 963, 967 (1971) (citing 4 A. Corbin, Contracts § 977). An award of damages arising from the repudiation will only be available, however, if plaintiffs were in a position to perform their obligations under the leases, such that it can fairly be said that the repudiation caused the loss.

See Carlson v. Leonardo Truck Lines, Inc., 13 Wn. App. 795, 803-05 (1975). Where the non-repudiating party still had time to comply with a condition precedent but was effectively released from its obligation to do so by the repudiation, the burden shifts to the repudiating party to demonstrate that the repudiation did not contribute materially to the non-occurrence of the condition precedent. Puget Sound Serv. Corp. v. Bush, 45 Wn. App. 312, 318 (1986).

Regardless of where the burden is placed, the evidence shows that the repudiation of the leases (*i.e.*, the issuance of the termination letters), did not materially contribute to or otherwise cause plaintiffs' inability to finance and deliver the buildings as specified in the agreements. All of the plaintiff LLCs except Oakley Dokley had lost control of the properties that were the subject of the leases before defendants tendered the notices of termination. With regards to Oakley Dokley, the LLC had defaulted, a foreclosure sale had been scheduled, and the LLC had declared bankruptcy when the notice of termination issued.[6] Because the location of the stores was a material element of the lease agreements, the loss of the properties meant that plaintiffs were unable to perform under their contracts. The losses preceded the termination letters and were in no way caused by the repudiation. In these circumstances, no reasonable jury could infer that, by declaring the deal over, defendants had caused plaintiffs' losses. See Hammes Co. Healthcare, LLC v. Tri-City Healthcare Dist., 801 F. Supp.2d 1023, 1038 (S.D. Cal. 2011) (finding that plaintiff's failure to secure the requisite ground lease meant that it could not perform its primary obligation under the contract – the construction and delivery of a building – and that defendant's anticipatory breach did not cause plaintiff's damages).

In an effort to rebut defendants' evidence, plaintiffs identify a number of reasons

---

[6] Less than a month after the bankruptcy court dismissed the bankruptcy petition, the property was sold at a trustee's sale. Defendants sent a second notice of termination, presumably because the one issued while the bankruptcy proceeding was open violated the automatic stay. In any event, Oakley Dokley had for months been unable to make payments on the promissory note and was clearly unable to retain control of the site when the first termination letter was sent.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT             -13-

why they were unable to retain control of the properties identified in the leases. The gist of the arguments is that the lending and investing communities did not want to lend on the projects because they were concerned about Rite Aid's financial condition. Plaintiffs enumerate the efforts they made to locate funding sources for the projects prior to the foreclosures, all of which were unavailing. Essentially, plaintiffs' evidence shows that they were unable to perform under the contract (*i.e.*, they were unable to retain control of properties, complete the landlord's work, and deliver the buildings) because the global economy was in the midst of a liquidity crisis and Rite Aid, plaintiffs' chosen business partner, was not well-placed to compete in the new environment. Risks associated with financing the projects were assigned to plaintiffs under the lease agreements, however, and, defendants have shown that the difficulties plaintiffs encountered preceded and were not the result of defendants' anticipatory repudiation.

Plaintiffs are essentially arguing that, because the delivery dates for many of the projects had been extended into the future, defendants are unable to prove that plaintiffs would not have been able to obtain financing and re-acquire the lost properties following the foreclosures in the absence of the repudiation. As discussed above, however, defendants have provided evidence that the properties were lost, that plaintiffs could not build and deliver the buildings, and that the repudiation had nothing to do with those facts. If left unrebutted, defendants' evidence clearly warrants summary judgment under Washington law. Plaintiffs, as the non-moving parties, have the burden of coming forward with evidence sufficient to raise a genuine issue of material fact. As described by defendants, the only "evidence" that the repudiation caused plaintiffs' losses is Nicholson's seemingly unfounded optimism that "if defendants had just agreed to change the terms of their leases in multiple unspecified ways and had given them more time, they might possibly, after having defaulted on all their prior land purchase contracts and loans, have been able to come up with new financing that had eluded them during two prior years of fruitless desperate searching." Dkt. # 96 at 7. Plaintiffs'

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT            -14-

1 hypothesizing is insufficient to allow this question to go to the jury: mere speculation does not
2 create a genuine issue of fact regarding plaintiffs' inability to fulfill the conditions precedent
3 when they had already lost the ability to develop the specified properties. See Record Realty,
4 Inc. v. Hull, 15 Wn. App. 826, 829-30 (1976) (a broker seeking payment of his commission
5 following an anticipatory repudiation must do more than simply rely on the existence of an offer
6 of purchase: he must also present evidence of the purchaser's financial condition sufficient to
7 show that he was able to pay the purchase price). Because a reasonable jury could not conclude
8 that plaintiffs would have obtained the benefit of their bargain but for the anticipatory breach,
9 plaintiffs' contract-based claims fail as a matter of law.[7]

### C. Washington Consumer Protection Act Claims

Plaintiffs have provided no new evidence that could support a finding that defendants' allegedly unfair or deceptive acts impacted the public interest. Their Consumer Protection Act claims therefore fail as a matter of law.

### D. Collateral Estoppel

The Court declines to decide the collateral estoppel issue defendants raised regarding the claims of NMP Concord, LLC.

### E. Thrifty's Counterclaim

At the 30(b)(6) deposition, plaintiff No One to Blaine, LLC's representative acknowledged that defendant Thrifty overpaid interim rent by the amount of $103,500. Whether the parties contemplated an amendment to the lease is irrelevant and does not give rise to a genuine issue of fact regarding the existence or amount of the overpayment. Thrifty is therefore

---

[7] The promissory estoppel claims are based in tort, and defendants make no effort to show that the causation analysis that applies to anticipatory repudiations governs the tort claim.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT           -15-

1  entitled to judgment against Nicholson and No One to Blaine, LLC, in the amount of $103,500.[8]

3  For all of the foregoing reasons, defendants' motion for summary judgment (Dkt. # 88) is GRANTED.  Plaintiffs' remaining claims are hereby DISMISSED with prejudice and judgment in the amount of $103,500 shall be entered in favor of defendant Thrifty Payless, Inc., and against plaintiffs Brent Nicholson and No One to Blaine, LLC.  The Clerk of Court is directed to enter judgment accordingly.  The parties' motions in limine (Dkt. # 105 and # 107) are DENIED as moot.

Dated this 5th day of February, 2015.

*/s/ Robert S. Lasnik*

Robert S. Lasnik
United States District Judge

---

[8] Plaintiffs do not contest dismissal of Nicholson's individual claims against both defendants or the dismissal of plaintiffs' quantum meruit claim, Poulsbo Holdings' promissory estoppel claim, or plaintiffs' Unfair Competition Law claim against defendant Thrifty.  Dkt. # 91 at 28.